My name is Eric Tindall. I am proud to be here representing my client, Lamaar Moore. Mr. Moore was charged and pled guilty to conspiracy to distribute marijuana in the Southern District of Iowa. A co-conspirator of his was his girlfriend, longtime paramour, Mikayla Rosenthal. The two lived on Jersey Ridge Road in Davenport for some time. At some point during the course of the investigation, that point being July 20th of 2017, a search warrant was executed on his home and there was marijuana, approximately two pounds, found in the home along with some empty bags with residue and a couple of scales. The primary issues that have been raised in the brief in this case deal with enhancements applied by the District Court. Those two enhancements are specifically focused on leadership role and premises. My intention this morning is to focus on premises, or excuse me, leadership role, but if there are questions concerning the premises argument, I'm happy to answer those as well. The evidence at sentencing primarily came through one cooperating witness and that witness was present during a phone call when he was out of state with Mr. Moore and Mikayla Rosenthal had called him and said there was somebody at the house to purchase marijuana. The specifics of the conversation from there are somewhat sparse, but it appears that Mr. Moore advised her as to where the marijuana could be found or how much and what it should be sold for. Based upon that evidence and effectively that evidence alone, the court assessed a leadership role which was a three-level enhancement under the circumstances of this case. So what's wrong with the evidence of the witness saying he told the girlfriend the quantity to supply? Well, I don't believe there's anything wrong with the evidence. I just don't believe it's sufficient to show that that is a control-type relationship. The leadership enhancement, even though it can be applied in a single transaction, is really... You don't have to have a large number of people under you. Well, if we take this out of the drug context and we just consider it a spouse calling their other spouse, saying your friend has shown up to pick up a folder, where is it at? Would we consider, we'll just say the husband in this case, would we consider that leadership or an in-charge control role when he advises his wife where that folder is at? If someone came and wanted to purchase something from me and I directed someone near me how much they were going to receive and how much to get in payment from the other person, there is a connection between the person selling the item and the person who's actually completing the transaction. I agree to the extent that some person, but we're not talking about some person in the facts of this case. We are talking about paramours who have children together, who have resided together for some time. The leadership dynamic is significantly different in those cases. These are two people who are helping each other out more as equals. Is there any case to indicate that a potential cohabitation relationship or paramour relationship, as you describe it, alters the analysis? Well, there is a case where, and I'm trying to think of which case it is. I believe he was a farmer who was growing marijuana on his field and his wife was indicted but acquitted. In that scenario, the Eighth Circuit had found that there was a leadership role because of the directions to the spouse. But the conspiracy involved in that case was considerably larger in terms of what was coming out of the premises. There were significantly more drugs. Here, the PSI suggests that essentially Lamar Moore was a street-level drug distributor who was not fully aware of the conspiracy's entire activities and that's contained in paragraph 157 of the pre-sentence investigation report and wasn't objected to. I'll reserve the balance of my time for rebuttal. Thank you, Mr. Tindall. Mr. Neiman? Good morning. May it please the court, counsel. My name is Nate Neiman. I represent Angelo Johnson. He's a co-defendant of Mr. Moore and Mr. Overton, who are also on this brief. Because of the limited time that I have here this morning for oral argument, I'd like to focus on one issue first and if I can get to the other issues or if the court has any questions about them, then I'd like to visit those issues after the first. The first issue that I'd like to raise is the denial of acceptance of responsibility here. Mr. Johnson pled guilty to a drug conspiracy charge for being involved in trafficking heroin and marijuana. And as a result of his guilty plea, the government agreed to dismiss the remaining counts in the case. After he pled guilty, the government submitted an offense conduct letter to probation who used that offense conduct letter to form a factual basis in the PSR. And when the PSR was issued, Mr. Johnson made several objections to facts contained in the PSR as well as enhancements assessed by probation. And after a hearing, after the sentencing hearing, which spanned two days, an afternoon and a morning, then the court determined that because Mr. Johnson challenged those enhancements and challenged some of the offense conduct that the government had submitted as part of its offense conduct letter, that he was not accepting responsibility. And I think that this is especially troublesome in this case where the government submitted the offense conduct letter and then probation made their drug weight determination based on the information in the offense conduct letter. And then when the PSR was issued, then the government objected to probation's determination of the drug weight. And not only just a minor objection, but they indicated that the drug weight should actually be increased by six levels. So we're talking about a huge increase in sentence here. And so that, of course, was something that Mr. Johnson challenged at sentencing, as well as firearm enhancements that were assessed. In his plea agreement, did he reserve any right to contest quantity? I believe, Your Honor, the plea agreement allowed him to make any comment at sentencing that he wished to make with respect to guideline issues. I don't think from my recollection that there was any agreement as to quantity. There certainly wasn't any agreement as to the quantity that the government was seeking and that the district court ultimately agreed with after the sentencing hearing. You know, I appreciate the fact that you have an objection to the loss of acceptance, particularly in light of the fact that there were at least three defendants that contested the drug quantity and that your client's the only one that lost acceptance in that process. The real issue I've got, though, is one about just really the standard of review that we apply, which is that the acceptance of responsibility determination titled to great deference and quote should be reversed only if it is so clearly erroneous so as to be without foundation. So it's some sort of clearly erroneous plus standard, you know, just no foundation at all for it, which seems like a really, really high burden to meet. So I'd like you to address really why this particular determination is just so clearly erroneous that it just cannot in good conscience stand. Well, Your Honor, I think that that's a very valid question and something that's difficult to overcome, frankly, given the standard of review. But if you look at the application note 1A231.1, the acceptance guideline, it says that a defendant is not required to volunteer or affirmatively admit relevant conduct beyond the scope of conviction in order to obtain a reduction under subsection A. And while I acknowledge that it's not automatic, the First Circuit has acknowledged, as I indicated in my brief, the importance of incentivizing defendants to plead guilty as a result or incentivizing defendants to plead guilty with this acceptance of responsibility credit, if you will, or reduction in guideline offense level. And I think that with respect to whether it was clearly erroneous in this case, even though it's not guaranteed by any means and even though the burden is on the defendant to show that he's entitled to the three points, I think in this case where the district court punished the defendant for objecting to something that, number one... Counsel, is the withholding of the points due to the objection or to what additional effort was placed upon the government? Generally, the rationale for not giving the additional discount in sentence is objecting causes the government to have to expend additional resources to prove its case. You're putting the government to its proof. In the sentencing time that you described, a couple of days, how much additional time was there attributed to the issue of the drug quantity? Well, Your Honor, most of the witnesses, I'd have to count them, but I think that three or four witnesses out of the four or five witnesses were offered for the purpose of drug quantity. Some of them did testify about seeing the defendant with a gun at some point, but those witnesses were primarily there for drug quantity because that was the government's objection. Therefore, it was the one that had to carry the water at sentencing. So, yes, Mr. Johnson did press the government to prove up that drug weight at sentencing, but it could have included that evidence in its offense conduct letters submitted to probation. I think that there would be a much greater argument for the defendant making the government use resources by disputing the information that's in the PSR. But in this case, the evidence that was submitted by the government at sentencing was in large part evidence that was not contained in the offense conduct letter and included in the PSR. So with that, I would like to reserve the rest of my time for rebuttal. Thank you, Mr. Newman. Mr. Kronk? Good morning. May it please the Court. I'm Cliff Kronk, counsel. I came prepared to address every issue raised by the defendants, and so I will address some of them even more than what they've addressed today. I'd like to start with the last statement by Mr. Newman concerning Angelo Johnson's acceptance of responsibility. Mr. Johnson pled guilty to conspiracy to distribute marijuana and heroin. His plea agreement required, and the factual basis for the plea, as well as what the necessary statutory requirements included in agreement or in admission, that he distribute at least 100 grams of heroin. When he came to sentence, when we did a plea agreement, and Your Honor asked if the government was limited in any way as to what we could argue in drug quantity and what the plea agreement said about that, and every one of my plea agreements, except for a very small percentage where we agree on a specific drug quantity, every one of my plea agreements, the ones I write, the ones that get approved by my supervisors, and the ones that these defendants sign, all say that the government has the ability to approve additional drug type and quantity above the minimum that the defendant is admitting for the purpose of the plea. So Mr. Johnson would not admit to more than roughly 100 grams of heroin, even though it was established that for multiple years, more than two years, he was selling heroin on a daily basis to, and I believe the witness said he found 16 customers of Mr. Johnson. The judge made it perfectly clear that he had not accepted responsibility because he was frivolously, or I'm not sure that the language in the acceptance of responsibility notes or commentary, say frivolously contest relevant conduct. She specifically found that he was not admitting to relevant conduct as he should, and she specifically noted that he was denying possession of a firearm in the face of substantial evidence that he had in fact possessed a firearm. I've also- I have just a question before we leave that. I found intriguing Johnson's argument that because the drug quantity established in the, or set forth in the pre-sentence investigative report was different than the drug quantity asserted by the government, and the government was asserting a greater quantity that, and I think I'm summarizing, this may not be exactly his words, but as long as he admitted to the amount in the original letter, the 100 grams, that then the burden sat on the government, and that merely contesting the government's evidence is therefore not accept- is not a denial of accept- is not a failure to accept responsibility because the burden rested on the government to prove the drug quantity because they were contesting the- and objecting to the quantity in the PSIR, which I find- that's an interesting argument, and one frankly that I hadn't really spent a lot of time thinking about, but I wonder what your response to that would be. Well, my response first is the government is burdened with providing an offense conduct to the defense, but we're also providing all of the discovery to the defense, which includes all the statements of the people who've already identified Mr. Johnson as their supplier, and of course just because it wasn't in the offense conduct letter, if other witnesses come forward or other evidence is developed between the time of the plea and the time of sentencing, the government's not barred from putting that on. Yeah, you're absolutely not barred. What I thought was intriguing was the argument that somehow because you have the burden, that them just merely holding you to the burden somehow should relieve them of the risk that they incur the judge's wrath, which I think- and like I said, I'm not sure what the answer is to that, but I thought it was an interesting argument. Well, my point- you know, I'm glad you used the word risk because in these cases, what we're dealing with when we're dealing with an Angelo Johnson or a Lamar Moore or a Cernise Overton, and as you saw from the pre-sentence report, this is a rather substantial drug case involving some pretty serious people carrying guns, and we seized a lot of guns. And what we're talking about is a group of risk takers. These are people who take risks every day. And they took- and Mr. Johnson took a risk, too, when he decided that all he was going to admit was that he conspired to distribute 100 grams of heroin and hoped that the government would not prove at sentencing that he actually was distributing multiple grams of heroin every day for years. And I believe Mr. Nieman's argument is something like if the government submits an offense conduct letter, they're stuck with it. And I don't think there's anything in the rules or in the sentencing guidelines or anything of that nature that suggests that we're stuck with that. The offense conduct letter is not the plea agreement, so it's not an agreement to be bound. That's essentially your argument. Yes, I would like to address for a moment a couple of points. I was sure I wasn't going to need very much time today, and now I'm seeing I'm using more than I expected. But with respect to the firearm, Mr. Nieman did not object at the time the pre-sentence report came out that this was Mr. Johnson's residence where the gun was found. And it actually wasn't objected to in his sentencing memorandum. He did not raise in his sentencing memorandum that where the gun was found in the basement in the dirt was not his residence. In his opening brief, he did not argue that the government failed to prove that this was Mr. Johnson's residence. But in his reply brief, he says the government has overstated the case with respect to whose residence this was, and we did not prove that it was Mr. Johnson's residence. Well, the reason that we didn't put on additional evidence of Mr. Johnson's residence is because of paragraph 132, which is not contested, and therefore the court can accept as fact. In paragraph 132 of the pre-sentence report, it says, on October 25th, LEO in Davenport, Iowa conducted an investigation of Angelo based upon the purchase of crack cocaine from him by a reliable CI. A search warrant was obtained for Angelo's residence in the 400 block of 9th Street in Davenport, Iowa. Prior to the search, Angelo was observed in front of the residence, but retreated into the house when uniformed officers arrived in response to a disturbance call. It goes on to later describe that in the residence that's previously been described as Angelo's residence, they found a gun in the basement. And we know the rest of the story is that Angelo had dirt on his pants, cobwebs in his hair, and the gun is found down in the dirt with his cell phone and a thumb print on it of his. The record is substantial that that firearm, when you consider a confidential informant, also in the pre-sentence report identifying that he had a gun when he ran into the house and told the police that, that he carried a firearm on that day. But there's also substantial evidence that he carried a firearm on other days at other times. And specifically, one of the witnesses, Christopher Schultz, was asked directly by Judge Ebinger, do you understand I'm going to have to decide today whether he had a gun? I have to decide what happened. Are you telling the truth? Did you see him with a gun? And he said yes. So we have a live witness in court saying he had a gun. We have police retrieving a gun from his residence. And the judge, of course, specifically found that it's not clearly improbable that the gun was involved with drug trafficking, especially in light of the fact that one of the people he was buying or selling drugs to witnessed him in possession of the gun. With respect to Mr. Moore, in his brief he says that there was no evidence of multiple controlled buys from the home. And I found that interesting because, yes, there was only one controlled buy that was made, and Lamar went into the home, got the pound of marijuana. No one saw him get the pound. Just before the deal happened, the pre-sentence report is clear. They're watching him. They're watching his brother. They have an informant that's buying a pound of marijuana for $3,500. They follow them to Lamar's house. Lamar goes in. Lamar comes out. They go across the street and sell the pound of marijuana to the informant. So we know that he's selling out of the house. He says in the next sentence, it was not the place transactions occurred. But the record shows that at sentencing he admitted first, Mr. Tindall stood before the court and was challenged by Judge Emiger, do you agree that Michaela Rosenthal was selling marijuana for your client when he was out of town? And he said yes. But the pre-sentence report specifically says, in paragraph 115, that Michaela Rosenthal admitted that she was getting her marijuana from Lamar, that she had five customers of her own, and that she was selling the marijuana out of 1227 Jersey Ridge Road, and it also says she was selling to his customers when he was unavailable or out of town. So that's kind of a double whammy there. First of all, she's selling for him and she's selling out of their joint residence. He noted today that this is different because they live together and they have a child together. Well, I want to correct the record on that. The pre-sentence report indicates that they did live together at 1227, but they have no children together. This is not elevated to some sort of a different situation because this is a spouse with a child living there together as a family. They may have been living together and her child may have lived there, but that doesn't exonerate him from his responsibility not to recruit other people into his drug business, not to have his significant other or anyone else selling for him. And that's exactly what he did. Now, the court has the ability under 3553A factors to vary downward if the court feels that the guideline range is too high. And I believe Mr. Moore got a variance. Those are the types of arguments that relate to, well, how serious was his leadership role? How many people really did work for him? But in this case, those are accounted for by the ultimate sentence by the court. The court isn't able, I don't think, to say, well, I'm going to ignore what is factually accurate, that she was selling drugs for him when he was out of town and that she was selling drugs out of the residence. They clearly had been selling pounds of marijuana, ounces of marijuana. One pound is 16 ounces. There's plenty of evidence in the pre-sentence report that he was selling ounces of marijuana. So there were nine empty one-pound wrappers and two full pounds hanging on the closet door, and there was digital scales and packaging material. The evidence is overwhelming that he was maintaining a premises, and it's overwhelming that he had employed another person to sell drugs for him. I don't really have anything else to address unless the court has questions. Then I'll yield the rest of my time. Thank you, Mr. Kroc. Thank you. Mr. Tindall, your rebuttal. Mr. Kroc and I have known each other for quite some time and have gone around these battles, but I'll never underestimate his ability to personalize legal arguments. I think it's fascinating that his focus was on the premises argument. I fully acknowledge that's a weaker argument of the two in this case because of U.S. v. Miller. The multiple control buys from the house is language straight out of Miller. It's an effort to distinguish this case from Miller in that ground because U.S. v. Miller at 698 F. 3rd 699 talks about multiple buys out of the house and so forth and probably significantly more quantities of drugs coming out of that house given it was methamphetamine. Are you asserting there's some difference between evidence that multiple sales took place out of the house as opposed to multiple control buys? There's a qualitative difference. The qualitative difference is that when there are control buys, we know the house is the source of those sales. When they're not, it is similar to ghost dope, frankly, which is we can't be certain exactly how many transactions, what's happening out of the house. Now storage, certainly there's evidence of storage in this case, but storage can be fairly contained and not the primary purpose of the home. I think the problem with Miller is that it really blurs the lines of what primary purpose is about. But I think that's why we have to go back to what the original purpose of these enhancements are. And when Mr. Kronk describes Mr. Moore as employing McKayla, I think that's a distraction. If we go back to Schwark, which is 961 F. 2nd 121, the purpose of this upward adjustment for leadership role is to punish persons who because of role tend to profit more and are a greater danger to the community. That's where the leadership role enhancement comes from. And I would argue to this court that that is not what this relationship was between Mr. Moore and Ms. Rosenthal. He was not profiting from her. They were shared in this. They were shared in the home. They were shared in the business. That is not leadership. That's relationship. And time and time again in case after case before the Eighth Circuit, the required evidence is about a dynamic of control in underling. In fact, in Ademo 772 F. 513, quoting Earlimar, they talk directly about procuring the aid of underlings. There's no evidence that was submitted to the court at the time of the sentencing that that was the relationship between Mr. Moore and Ms. Rosenthal, that he was a primary and she was an underling. To assume otherwise, frankly, is concerning about gender dynamics. It suggests that it is intuitive that the female in the relationship would be the underling, and I don't think that can be the holding ever. The evidence in this case is not that Mr. Moore had a leadership in this relationship. It's that he had a relationship. As part of that relationship, the two of them used marijuana. The two of them sold marijuana. Mr. Moore pled guilty to having sold marijuana. I would argue that the district court misapplied the leadership role in this case. By applying that three-level enhancement, even though there was a variance, that variance downward becomes skewed because that three levels should have never been applied. In addition, if you look at my sentencing memorandum concerning premises, I had asked the court to consider a one-level variance as the premises being over-representative, and there's no way for us to tell whether the district court accepted that argument on premises but applied the full three levels concerning leadership role. For all those reasons, Your Honor, on behalf of Mr. Moore, I would request that this court reverse the sentencing that was imposed in this case and remand for further proceedings. Thank you. Thank you, Mr. Shindle. Mr. Nieman. Thank you, Your Honor. Judge Erickson, I wanted to address an issue that you were speaking to Mr. Kronk about, and that's specifically with respect to the submission of the offense conduct letter. When the offense conduct letter from the government forms the factual basis for the PSR, and then the defendant thereafter challenges information that is in the PSR that's derived from the offense conduct letter or enhancements that are applied after probation reviews the offense conduct letter, it creates a perverse incentive for the government to load up that offense conduct letter with as much as they possibly can that wasn't contemplated by the plea agreement, knowing that if the defendant challenged that later at the time of sentencing, then he could risk losing the acceptance or responsibility. Now we want to talk about risk-taking. The government, when it's submitting its offense conduct letter, it's bearing no risk because if it doesn't get the enhancements that it wants or it doesn't prove up the drug weight that it wants, it loses nothing because it didn't agree to that as part of the plea agreement. But if the defendant does, all of a sudden he's the one that's assuming the risk. So when the facts of the case, as they are to be determined at sentencing, are submitted in the way that they are submitted, then it places an unfair advantage on the government and against the defendant when it prohibits him from actually challenging the government's evidence at the time of sentencing. And for those reasons and the reasons stated in my brief, we would ask the court to reverse the sentence and remand for resentencing. Thank you. Thank you, Mr. Nieman. Thank you also, Mr. Tyndall and Mr. Kroc. The court appreciates the argument you provided to us this morning on this case and the briefing which you've submitted. We'll take the case under advisement. May be excused.